**CALCASIEU MARINE NATIONAL BANK, Plaintiff–Appellant,**

v.

**Thomas Arthur GRANT, III, Defendant–Appellee.**

**Suzanne Brunazzi GRANT, Plaintiff–Appellee,**

v.

**Thomas A. GRANT, III, Defendant–Appellant.**

**Nos. 90–4249, 90–4261.**

United States Court of Appeals, Fifth Circuit.

Oct. 17, 1991.

W. Joe Mize, Wade N. Kelly, Carmouche & Gray, Lake Charles, La., for Calcasieu Marine Nat. Bank.

William Paul Lawrence, II, Comegys, Lawrence, Jones, Odom & Spruiell, Shreveport, La., for Thomas Arthur Grant, III.

James L. Paxton, Kevin R. Tully, W.K. Chritovich, Chritovich & Kearney, New Orleans, La., for Suzanne Brunazzi Grant.

Before CLARK, Chief Judge, REAVLEY and JONES, Circuit Judges.

CLARK, Chief Judge:

Suzanne Grant (Mrs. Grant) brought this action against her former husband, Thomas Grant, III (Grant) and others. She claimed violations under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, and asserted unfair trade practices, fraud, negligence, and tort claims under Louisiana law. She settled with all of the defendants except Grant before trial. The jury found that Grant violated the RICO statute and the Louisiana Unfair Trade Practices and Consumer Protection Act and committed fraud under Louisiana law. We affirm the verdict as to the state law fraud claims and reverse as to the RICO claim.

Mrs. Grant's action was consolidated for trial with an action covering many of the same events which was brought by Calcasieu Marine National Bank (CMNB) against Grant and the others who had been named as defendants in Mrs. Grant's action. CMNB settled its claims against all defendants except Grant before trial. The jury found that Grant did not violate the RICO

statute and was not guilty of fraud or negligence under Louisiana law with respect to CMNB. We affirm.

The facts are set out by transaction groups.

### A. Nineteen Seventies Dealings.

During the mid–1970s James Steele, III (Steele), a business associate of Mr. Grant, obtained loans from Ouachita National Bank (ONB) by allegedly giving kickbacks to Benjamin Marshall (Marshall), ONB's chief lending officer. Grant was not involved in any of these loans.

### B. Aurelle Field and Modoc Partnership.

In 1980, Primos Production, a mineral development partnership in which Grant was an active member, began borrowing money from ONB to finance purchases of mineral leases in the Aurelle Field in Arkansas. Later in the year, Marshall's twenty-year old son, Biff, purchased a $1/16$ working interest in the leases for a partnership called Modoc Petroleum, which consisted of Mr. Marshall's children. Grant arranged Biff's purchase and did not disclose the arrangement to the other Primos partners. Biff testified that he financed the purchase through a loan from American Bank in Monroe, Louisiana. It is unclear whether Marshall personally guaranteed the loan.

Through Marshall, Grant obtained a line of credit at ONB which Primos used for drilling expenses. Marshall did not disclose to the appropriate ONB officials that he and his children had an interest in the leases. By May 1981, the Aurelle Field had not proved to be successful. According to CMNB, Grant and Steele later bought out Modoc to persuade Marshall to loan money to Grant and Steele for a larger deal involving the Cities Service Corporation.

### C. Cities Service Deal.

In 1982 Cities Service Corporation offered land and mineral interests for sale. Steele and Grant successfully offered to buy the properties for approximately $36 million and, allegedly, bribed Marshall to secure an ONB loan, of approximately $10 million towards the purchase, by buying out Modoc and giving Marshall part of the property purchased.

### D. CMNB Loan Participation.

The $10 million loan was in excess of ONB's legal lending limit. Marshall contacted a number of banks, and asked them to purchase a participating interest in the loan. During these contacts Marshall did not disclose: his prior relationship with Steele, the Aurelle and Modoc transactions, or his personal interest in securing the loan. CMNB purchased a 40% participation interest in the loan from ONB.

### E. Bankers First.

The Grants and others obtained a loan from ONB to finance the purchase of stock in Bankers' First, a Georgia S.L. Grant allegedly arranged a kickback for Marshall in order to get the loan. In connection with this deal, Marshall was indicted for, and pleaded guilty to, failing to disclose his interest in the ONB loan. Grant was investigated, but was not indicted.

CMNB alleges that it also made loans to Grant and others in connection with the Bankers' First stock purchases.

### F. Cross Collateralization of Primos.

Grant was a partner in Primos. Mrs. Grant claims that she, too, was a partner in Primos based on her Louisiana community property rights. Grant claims that, under Louisiana law, she was not a partner, but agrees the community had an interest in the value of Grant's partnership interest.

Grant mortgaged the community's interests in Primos' oil and gas properties as security for additional Cities Service loans from ONB. Mrs. Grant signed loan documents relating to this transaction. But she claims she would not have done this had she known of the other Steele–Marshall–Grant dealings in which ONB was involved. She claims that Grant engaged in the transactions as part of a scheme to eliminate her community interest in Primos.

## G. Formation of OFT.

Around 1988, Grant and Steele were involved in a lender liability action against ONB. After the Grants were divorced, Grant settled with ONB. The confidential settlement agreement required Grant to assist in foreclosing on collateral.

During his marriage to Mrs. Grant, Grant formed several partnerships. The assets of Grant's partnerships, including Primos, were transferred to OFT Service Corporation. Mrs. Grant was not a shareholder of OFT. Ultimately, ONB acquired OFT, through foreclosures in which Grant participated as an attorney.

In Mrs. Grant's action, the jury found that Grant violated the RICO statute and the Louisiana Unfair Trade Practices and Consumer Protection Act. The jury also found that Grant committed fraud and was negligent under Louisiana law. Mrs. Grant was awarded $400,000 which was trebled under RICO. Grant filed a Motion for Judgment Notwithstanding the Verdict (JNOV), New Trial or Remittitur. The trial court denied this motion. Grant appeals.

The jury also found that Grant did not violate the RICO statute or commit fraud or act negligently under Louisiana law with respect to CMNB. CMNB filed a Motion for JNOV or a New Trial. The trial court denied this motion. CMNB appeals.

## JURISDICTION

Mrs. Grant raises an initial challenge to this court's jurisdiction to hear Grant's appeal. In February 1990, Grant filed a Motion for JNOV, New Trial, or Remittitur. The motion was overruled on March 6, 1990. On April 5, 1990, Grant filed both a notice of appeal and a motion for reconsideration of the court's denial of his state law prescription defense. On June 19, 1991, the court entered an order holding the motion to reconsider pending the outcome of this appeal. Grant did not file a new notice of appeal.

Mrs. Grant contends that since Grant did not refile his notice of appeal after his motion to reconsider the state law prescription defense was acted on, his April 5, 1990, notice is without effect and the appeal must be dismissed.

Rule 4(a)(4) of the Federal Rules of Appellate Procedure provides:

> If a timely motion under the Federal Rules of Civil Procedure is filed in the district court by any party: (i) for judgment under Rule 50(b); (ii) under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; (iii) under Rule 59 to alter or amend the judgment; or (iv) under Rule 59 for a new trial, *the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion. A notice of appeal filed before the disposition of any of the above motions shall have no effect.* A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion as provided above. No additional fees shall be required for such filing.

(Emphasis added). Grant complied with the rule by filing a notice of appeal after the court denied his Rule 59 motion for a new trial. Rule 4(a)(4) does not require the filing of a second notice of appeal after the court declined to act on a motion to reconsider its ruling on a prior Rule 59 motion. Despite its harsh and often unanticipated consequences, we have strictly construed and applied the language of Rule 4(a)(4)(iv). *Harcon Barge Co. v. D. & G. Boat Rentals, Inc.*, 784 F.2d 665 (5th Cir.1986) (en banc), *cert. denied,* 479 U.S. 930, 107 S.Ct. 398, 93 L.Ed.2d 351 (1986). However, we decline to exact its penalty by implying it applies to any motions not expressly set out in the Rule. Mrs. Grant was clearly put on notice that Grant was appealing from the order overruling his motion for JNOV, a new trial, and a remittitur. The district court's action on the motion was also fully consistent with the fact that an appeal was underway. This court has jurisdiction to hear Grant's appeal.

## ABSTENTION

Grant argues that the lower court should have sustained his motion to dismiss on grounds of abstention because the case involves Louisiana domestic relations law.

He relies on *Dubroff v. Dubroff*, 833 F.2d 557 (5th Cir.1987).

In *Dubroff*, an ex-wife brought a RICO claim against her ex-husband and his law firm for fraud in connection with a community property settlement. We abstained because to proceed would have deeply involved this court in the "novel and dubious questions of state family law" which were presented, and because all of the federal claims could have been brought in the state court. 833 F.2d at 561–62.

But the Grants' divorce action has been concluded. This action implicates no Louisiana family law issues of child custody, alimony, visitation rights, separation or divorce which could involve a federal court in such state affairs. Nor is there an attack on a community property settlement. Here, we are asked only to deal with a possible RICO violation, and pendent claims of fraud and negligence. While we recognize our action may create claims for credits in pending state law proceedings, we will not become involved in any of the domestic law snares which *Dubroff* eschewed. The lower court did not err in overruling Grant's motion to dismiss on grounds of abstention.

### EVIDENCE OF SETTLEMENT

In one of several compromises, CMNB settled with ONB, Modoc, Steele and Marshall. CMNB challenges the district court's failure to exclude references to the fact and amount of its settlement in the proof and in Grant's closing argument.

Under FED.R.EVID. 408, settlement evidence is inadmissible to prove liability for a claim or invalidity of the claim or its amount. FED.R.EVID. 103 provides, however, that error may not be predicated on a ruling admitting evidence unless a substantial right of the party is affected *and* "a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context ..." FED.R.EVID. 103(a)(1). Where no such objection appears, the trial court's admission of evidence is reviewed for "plain error." FED. R.EVID. 103(d).

### A. Adequate Objection.

■ During the cross-examination of CMNB's president by counsel for Grant the following took place:

COUNSEL: Okay. Now let's talk a little bit about the complaints you filed in this particular lawsuit.

THE COURT: The one the bank filed?

COUNSEL: I'm sorry.

COUNSEL: Let's talk a little bit about the lawsuit the Calcasieu Marine filed. Do you remember the date the suit was filed by your lawyers?

WITNESS: No, sir.

COUNSEL: Let me show you a document and ask if you can identify it, sir. It's loose, so be careful.

WITNESS: It shows Calcasieu Marine National Bank of Lake Charles Plaintiff versus The Ouachita National Bank in Monroe, Ben F. Marshall, Modoc Petroleum and Thomas Arthur Grant, III, Defendants.

COUNSEL: When was that suit filed, sir?

WITNESS: December 6, 1988.

COUNSEL: Now you mentioned some individuals there. Let me see if I can read those. Defendants originally named in this lawsuit?

CMNB COUNSEL: Your Honor, *I object to the relevancy of the other parties in this suit.*

THE COURT: All right, side bar.

An off the record discussion was had at the bench between counsel for the respective parties and the court, after which, the following occurred:

THE COURT: Overruled. Proceed.

Following this ruling, the settlement agreement was referred to a number of times during the trial without objection.

The side bar conference was not recorded by the court reporter or made a part of the record. CMNB argues that the objection made there was, in substance, a Rule 408 objection. Grant argues that there was no specific Rule 408 objection, that the side bar conference concerned the relevancy of admitting proof that other parties were originally sued and that the admission of

the settlement evidence was not plain error.

CMNB filed a Motion to Supplement Record on Appeal. FED.R.APP.PROC. 10(e). At the hearing on this motion, the following occurred:

COUNSEL FOR GRANT: Rule 103 ... uses the word timely objection or motion to strike appears of record stating the specific grounds of objection. And I guess my point in bringing that up is that the credibility of the testimony with regard to what objection was made is affected somewhat by the fact that there was no effort made to specifically have the court put it on the record. If it was deemed an important evidentiary objection, I think that burden would be on the objecting party. And then the code article says that the grounds for the objection has to be specific and stated specifically.

THE COURT: Yes. Well according to Mr. Mize, he did state it. He stated relevance, which brings it under the 400.

COUNSEL FOR GRANT: Brings it under 401 and 402, yes, sir.

THE COURT: Brings it under the whole 400 series.

COUNSEL FOR GRANT: Your Honor, I would point out in that connection that there was an objection lodged by Calcasieu Marine to this compromise agreement in the pretrial order, and the specific rules cited were 401 and 402.

THE COURT: Right. Okay, that's fine. Go ahead.

COUNSEL FOR GRANT: And so our position is going to be that there was no 408 objection made. And that had such objection been made, we certainly would have pulled out Rule 408 and wanted to get the applicability of that rule to this particular compromise, and also to the other compromise agreements that got admitted in the case. And there were several, including the one Ms. Grant entered into with O.N.B.

\* \* \* \* \* \*

THE COURT: I simply have no recollection of any of this. I will tell you that I would be surprised if anybody brought up an objection to the admissibility of a settlement agreement and I overruled that objection to the admissibility of the settlement agreement.

\* \* \* \* \* \*

The Rule 10(e) hearing record also reflects that at an evening recess one of the counsel for CMNB may have made a specific reference to Rule 408 as a basis of objection to the settlement agreement proof. Assuming counsel's recollection is correct, it was made after the evidence had gone into the record, and another witness had testified. It was never made the subject of a motion to strike. It was never ruled on by the court. Indeed, the only response by the court which counsel could recall was "You're kidding." The hearing record does not reflect that counsel opposite participated in the dialogue between CMNB counsel and the court, and counsel for Grant asserts he never heard Rule 408 mentioned.

The strongest argument that can be made for a Rule 408 objection having been timely raised is the trial court's statement that an objection based on relevance "brings it under the whole 400 series." If the judge had made such a contemporaneous ruling, we might have a different issue. He did not mention this until the post-appeal hearing. A number of settlement agreements were received in evidence in the course of these trials. The admission of others could have been affected by a selective ruling on this one. A specific objection going to the admissibility of the settlement agreement *per se*, as opposed to the identity of parties previously sued, was necessary to put counsel on notice that something further than an objection based on relevance of the identity of such parties was being urged. Here, no notice was given by counsel or the court to the party tendering the evidence. "Rulings on evidence cannot be assigned as error unless ... the nature of the error was called to the attention of the judge, so as to alert him to the proper course of action and *enable opposing counsel* to take proper corrective measures." FED.R.EVID. 103(a), notes of advisory committee (emphasis added). Neither the original record nor the

Rule 10(e) supplementation discloses that an adequate Rule 408 objection was timely made.

### B. Plain Error.

■ Assuming that CMNB's continued silence as counsel opposite went beyond naming past parties and developed the amounts paid did not constitute a waiver of any right to object here, there is no reversible error, unless the admission of the settlement agreement is plain error. Plain error is error which, when examined in the context of the entire case, is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity, or public reputation of the judicial proceedings. *Permian Petroleum Co. v. Petroleus Mexicanos*, 934 F.2d 635, 647 (5th Cir.1991); *United States v. Guzman*, 781 F.2d 428, 431–32 (5th Cir.1986), *cert. denied*, 475 U.S. 1143, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986).

Viewed in light of the whole case, the admission of the settlement agreement was not plain error. Evidence of this settlement agreement could have helped CMNB's case by implying to the jury that, since other parties had recognized and recompensed for their liability, Grant should too. Furthermore, proof of other settlements was addressed. How they all helped or hurt CMNB has not been shown. It is too late for CMNB to now urge that evidence of the settlement agreement could have harmed its case by implying to the jury that CMNB has already recovered enough for its damages.

The lower court did not commit reversible error in admitting evidence of the settlement.

## RICO CLAIMS AND FRAUD

Grant argues that the court erred in overruling his motion for JNOV, new trial, or remittitur for the jury awards for Mrs. Grant's RICO claim and her state law fraud claims.

CMNB contends that the court erred in overruling its motion for JNOV or a new trial on its RICO and state law claims against Grant.

■ A motion for JNOV may not be granted where "there is substantial evidence in the record raising a relevant fact issue for determination by the jury." *Eyre v. McDonough Power Equipment, Inc.*, 755 F.2d 416, 420 (5th Cir.1985). "In assessing motions for new trial or remittitur the court is called upon to determine whether the verdict is excessive or contrary to the weight of evidence or has resulted in a miscarriage of justice." *Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir.1986).

### A. State Law Claims.

Under Louisiana law the elements of a claim of fraudulent misrepresentation are: "(1) a misrepresentation [or suppression] of a material fact, (2) made with the intent to deceive, and (3) causing justifiable reliance with resultant injury." *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1131 n. 33 (5th Cir.1988). Substantial evidence on all of the elements was properly before the jury.

### (1) Mrs. Grant's Action

■ Grant challenges the jury's award to Mrs. Grant based on her state law fraud claims. Substantial evidence supports the jury's finding that Mrs. Grant was injured by Grant's twisting of her property interests in the Primos partnership by his creation of, and transfer of Primos properties to, OFT Services Corporation. This is augmented by proof of the secret foreclosure of Primos properties Grant arranged with ONB. The damages awarded are also amply supported. We affirm the jury's fraud award of $400,000 to Mrs. Grant.

### (2) CMNB's Action

■ CMNB challenges the jury's finding that Grant did not commit fraud under Louisiana law against CMNB. The affirmance of Mrs. Grant's verdict does not control CMNB's action. It involved different actions taken on different occasions as to a different plaintiff. We do not, however, depart from the highly deferential standard of appellate review of jury fact determination. Although reasonable minds could disagree on the result, there is substantial

evidence in the record to raise relevant fact inferences which permit the conclusion that Grant did not misrepresent or suppress any material fact with the intent to deceive or did not cause justifiable reliance by CMNB with resulting injury to it. Therefore, we affirm the jury's verdict in favor of Grant on CMNB's state law claims of fraud.

## B. RICO Claims.

Grant challenges the jury's finding of a RICO violation which injured Mrs. Grant. CMNB challenges the jury's finding in its case that Grant committed no RICO violation against it.

■ Four distinct RICO violations are defined in 18 U.S.C. §§ 1962(a)–(d).[1] Common elements are present in all four offenses. *Ocean Energy II v. Alexander & Alexander, Inc.*, 868 F.2d 740, 742 (5th Cir.1989); *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988), *cert. denied*, 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836. "Reduced to its three essentials, a civil RICO claim must involve: (1) a *person* who engages in (2) a *pattern of racketeering activity*; (3) connected to the acquisition, establishment, conduct, or control of an *enterprise. Delta Truck*, 855 F.2d at 242. A RICO conspiracy claim based on § 1962(d) also requires the existence of an enterprise. *Manax v. McNamara*, 842 F.2d 808, 812 (5th Cir.1988). Since no "enterprise" or "pattern of racketeering" was established in either case, the RICO claims should not have been submitted to the jury.

### (1) Enterprise

An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

■ A RICO association in fact enterprise must be shown to have continuity. *Landry v. Air Line Pilots Ass'n Intern. AFL–CIO*, 901 F.2d 404, 433 (5th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990). *See also, United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981); *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 243 (5th Cir.1988). "We have incorporated this notion of continuity into our definition of such enterprises. An association in fact enterprise (1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization and (3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making structure." *Delta Truck*, 855 F.2d at 243. *See Landry v. Air Line Pilots Ass'n Intern AFL–CIO*, 901 F.2d 404, 433 (5th Cir.1990); *Manax v. McNamara*, 842 F.2d 808, 811 (5th Cir.1988); *Foval v. First Nat'l Bank of Commerce*, 841 F.2d 126, 129–30 (5th Cir.1988); *Montesano v.*

1. (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

*Seafirst Commercial Corp.*, 818 F.2d 423, 426–27 (5th Cir.1987); *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438, 440–41 (5th Cir.1987), *cert. denied*, 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 780 (1987); *Shaffer v. Williams*, 794 F.2d 1030, 1032 (5th Cir.1986).

■ Since an association in fact enterprise must have an existence separate and apart from the pattern of racketeering, *Delta Truck*, 855 F.2d at 243, proof of a pattern of racketeering activity does not necessarily establish a RICO enterprise. *Montesano*, 818 F.2d at 427. *See also United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981); *United States v. Phillips*, 664 F.2d 971, 1013 (5th Cir.1981) "An enterprise must be more than a summation of predicate acts." *Ocean Energy II v. Alexander & Alexander, Inc.*, 868 F.2d 740, 748 (5th Cir.1989). *See also Landry*, 901 F.2d at 433–34.

### (a) Mrs. Grant's Action.

At trial, a single jury interrogatory asked whether Grant violated RICO §§ 1962(a), (b), (c) or (d). At this point, we will deal with the sufficiency of the proof, not the form of the interrogatory. If all of the subsections were unsupported by the evidence, no part of her claim should have been submitted to the jury.

Mrs. Grant alleges that Grant was involved in deals which resulted in the loss of her interest in Primos. It is unclear, however, what sort of enterprise she attempted to establish. She contends that a number of acts Grant undertook in association with various parties at various times eventually led to her loss. She did not show, though, the separate existence, or even the existence, of an enterprise which had the requisite continuity. *See United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). She was "required to show that the enterprise as a whole functioned as a continuing unit." *Landry*, 901 F.2d at 433. Allegations of *"multiple acts of fraud* that were part and parcel of a single, discrete, and otherwise lawful commercial transaction" do not state a RICO claim. *Delta Truck*, 855 F.2d at 244 (emphasis added).

■ "Continuity or the ongoing nature of an association in fact is the linchpin of enterprise status." *Ocean Energy II*, 868 F.2d 740, 749 (5th Cir.1989). The enterprise must have continuity of its structure and personnel, which links the defendants, and a common or shared purpose. *Shaffer v. Williams*, 794 F.2d 1030, 1032–33 (5th Cir.1986).

■ Clearly the evidence established that Grant associated with other parties to deprive Mrs. Grant of her interest in Primos. However, no other transactions outlined in the facts above—the Nineteen Seventies dealings, Aurelle Field and Modoc Partnership, Cities Services Deal, CMNB Loan Participation, and Bankers' First—were shown to be parts of a continuing unit linked to the cross collateralizing of Primos and the formation and collapse of OFT. The latter were the actions which resulted in Mrs. Grant's loss. The fact that Steele and Marshall or Steele, Marshall and Grant had on other occasions, in some combination, associated in other transactions is of no moment unless such prior associations established the existence of a coherent racketeering entity with the requisite continuity to make it an association in fact.

The jury could have found that Grant fraudulently took Mrs. Grants' Primos interest, but this was only a single, short-term goal. The alleged association with Marshall and ONB had to have been for the accomplishment of this goal. However, such an ad hoc association would lack the continuity required to support a RICO claim. *Manax*, 842 F.2d at 812 ("The association as alleged has one short-term goal—the destruction of Manax's medical practice—and presumably will disband upon attainment of that goal. There is, as a result, nothing linking the members of the association to one another except the commission of the predicate criminal acts." *Id.* at 811). *See also Landry*, 901 F.2d at 433–34 (Once the result was obtained and the follow-up actions taken, the enterprise ceased to exist. There was no RICO association in fact); *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423 (5th Cir. 1987).

The mere fact that at other times, for other different and limited purposes unrelated to Mrs. Grant or to each other, Grant associated with Marshall or Steele or both in acts in which Marshall was bribed to misuse his position with ONB is not sufficient to establish associational continuity. No proof showed these separate misdeeds to be anything more than episodic acts of wrongdoing by persons who knew the others were susceptible to participation in the particular fraudulent activity then contemplated.

In *United States v. Thevis*, 665 F.2d 616, 625 (5th Cir.1982), we held that the "[u]se of the verb 'includes' in the statutory definition [of a RICO enterprise] indicates congressional intent not to limit a RICO enterprise to the specific categories listed." In *Delta Truck*, 855 F.2d at 242, we noted, however, that although Congress wrote RICO in broad, sweeping terms it did not intend to extend RICO to every fraudulent commercial transaction. The requirement of "continuity" limits the enterprises which civil RICO actions may reach. *Delta Truck*, 855 F.2d at 242.

The association of Grant with other parties "briefly flourished" and then "faded away" after Mrs. Grant was deprived of her interest in Primos. This association does not meet "the requirement that [the enterprise] function as a continuing unit." *Landry*, 901 F.2d at 433. There was no continuity of the alleged association's structure or personnel, and there was no common or shared purpose in the discrete acts of its members. Without these elements, there is no RICO association in fact enterprise.

### (b) CMNB's Action.

A jury interrogatory asked whether Grant violated RICO §§ 1962(c) or (d) with respect to CMNB. The jury answered that he did not.

Our holding as to Mrs. Grant's RICO claim makes additional discussion here unnecessary. Since no "enterprise" which possessed the requisite "continuity" was established, CMNB's RICO claim is also unsupported. "The evidence before the court establishes only the existence of a commercial loan transaction.... This in

no way suggests an 'association in fact' to satisfy the definition of an enterprise under 18 U.S.C. § 1961(4)." *Foval v. First Nat'l Bank of Commerce in New Orleans*, 841 F.2d 126, 129 (5th Cir.1988).

### (2) Pattern of Racketeering Activity

A RICO plaintiff must also establish that there was a "pattern of racketeering activity." *Delta Truck*, 855 F.2d at 242. Mrs. Grant contends that Grant committed a number of RICO predicate acts, including commercial bribery, mail fraud, and wire fraud. She contends that these acts were part of a pattern of racketeering activity which furthered the enterprise's plan and were related to the scheme of acquiring her Primos property interest.

Assuming for the sake of this discussion that the acts alleged constitute "racketeering activity," the second RICO essential is not established unless the acts establish a "pattern" of racketeering activity.

In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court revised and clarified the RICO pattern requirement. *Landry v. Air Line Pilots Ass'n Intern. AFL-CIO*, 901 F.2d 404, 432 (5th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); *Smith v. Cooper/T. Smith Corp.*, 886 F.2d 755, 756 (5th Cir.1989).

We have held that *H.J. Inc.*, narrowed the pattern definition from that we previously used. *Landry*, 901 F.2d at 432, *Smith*, 886 F.2d at 756. We can no longer use the broad pattern definition adopted in *R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1355 (5th Cir.1985).

In *H.J. Inc.*, the Court held "that to prove a pattern of a racketeering activity a plaintiff ... must show that the racketeering acts are related *and* that they amount to or pose a threat of continued criminal activity." 109 S.Ct. at 2900. The acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 109 S.Ct. at 2900. *See also Landry*, 901

F.2d at 432. The Court had more difficulty defining the pattern continuity requirement. The Court adopted a flexible approach for continuity. A party may show "continuity over a closed period by proving a series of related predicates extending over a substantial period of time" or by proving "past conduct that by its nature projects into the future with the threat of repetition." 109 S.Ct. at 2902.

### (a) Mrs. Grant's Action.

Arguably, Mrs. Grant's allegations of predicate acts establish the pattern "relationship element." However, they lack the requisite continuity. Mrs. Grant contends that Grant and others committed predicate acts which deprived her of her Primos interest. She alleges that the acts occurred over an extended period and that they demonstrate a closed end threat.

A closed end threat, however, is shown by "proving a series of *related* predicates extending over a *substantial* period of time." *H.J. Inc.*, 109 S.Ct. at 2902 (emphasis added). Here, the predicate acts included alleged wire fraud and mail fraud by Grant and others which would constitute isolated instances of wrongdoing to secure separate and discrete goals, rather than related or connected acts that could rise to the level of continuity required under *H.J. Inc.* In addition, there is no threat here of continued criminal acts. Grant's acts which were alleged to have deprived Mrs. Grant of a property interest were, when completed, without threat of repetition. Short-term criminal conduct is not the concern of RICO. *H.J. Inc.*, 109 S.Ct. at 2902. Even where acts may support indictment for mail or wire fraud, they may be insufficient for RICO liability. *Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 193 (5th Cir.1990). "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the pattern] requirement." *H.J. Inc.*, 109 S.Ct. at 2902.

There is no "pattern of racketeering activity" to support Mrs. Grant's RICO claim. For this added reason, her RICO claim should not have been submitted to the jury.

### (b) CMNB's Action.

CMNB contends that Grant, Steele, and Marshall operated as a continuing association-in-fact enterprise. CMNB alleges that the continuing and related criminal activity spanning several discrete but related schemes constitute closed period continuity under *H.J. Inc.*

Grant's acts, which in any way affected CMNB, were isolated acts. They were not part of a "series" of acts with the level of continuity that is required for a RICO violation. The essential flaws in demonstrating that a continuing racketeering association ever existed are as apparent as to CMNB as they are as to Mrs. Grant.

Since there is neither an "enterprise" nor a "pattern of racketeering activity" which would support CMNB's RICO claim, we affirm the lower court's verdict in favor of Grant on CMNB's RICO claims.

### MOTIONS FOR NEW TRIAL

Grant contends that the lower court erred in overruling his motion for a new trial or remittitur in Mrs. Grant's action. CMNB contends that the lower court erred in overruling its new trial motion.

▬ Our standard of review of motions for new trial or remittitur is set out above. *See Pinner v. Schmidt,* 805 F.2d at 1262. The decision to grant or deny a motion for a new trial is committed to the sound discretion of the trial court. We will not reverse unless an abuse of that discretion is shown. *Treadaway v. Societe Anonyme Louis–Dreyfus,* 894 F.2d 161, 164–65 (5th Cir.1990); *Dixon v. Int'l Harvester Co.,* 754 F.2d 573, 586 (5th Cir.1985). This deferential standard of review applies especially where the motion for a new trial was denied. *Dixon,* 754 F.2d at 586. When the motion has been denied, "all the factors that govern our review of his decision favor affirmance." *Treadaway,* 894 F.2d at 164–65 *quoting Shows v. Jamison Bedding, Inc.,* 671 F.2d 927, 930 (5th Cir.1982).

The sole basis for a new trial which might have merited discussion—the use of a single interrogatory which asked the jury to find whether Grant's conduct violated

§ 1962(a), (b), (c) or (d)—is mooted by our holding that the RICO claim should not have been submitted to the jury. No other basis appears which would warrant our review of the district court's exercise of discretion to deny a new trial.

## OTHER ERRORS

Grant also contends that the trial court erred: in refusing to permit J. Michael Hart to enroll as counsel; in overruling his motion in limine as to several pieces of evidence; in granting Mrs. Grant's *ex parte* motion in limine to exclude evidence affecting Steele's credibility; in permitting Mrs. Grant to amend her pleading on the sixth day of trial to allege the Banker's First transaction as a predicate offense; in excluding his proffer of a legal opinion; in limiting his narrative responses and reprimanding him; in limiting his testimony; in upholding the constitutionality of the RICO statute; and, in rejecting his other challenges to the state law claims, including the prescription defense.

Other than those issues already discussed in this opinion, the issues raised by Grant do not require discussion. They implicate no substantial rights. FED.R.CIV.P. 61.

## CONCLUSION

In Mrs. Grant's action, we AFFIRM the district court's judgment insofar as it awards her $400,000 in damages on her state law fraud claims. The remainder of the judgment is REVERSED.

In CMNB's action, we AFFIRM the district court's judgment.

Mrs. Grant is entitled to recover one-half of her costs on this appeal. All remaining costs on appeal shall be divided equally between Grant and CMNB.